# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

| LISA FINNEY, | : | Case No. 3:18-cv-267 |
| --- | --- | --- |
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Lisa Finney brings this case challenging the Social Security Administration's denial of her application for period of disability and Disability Insurance Benefits. She applied for benefits on November 6, 2014, asserting that she could no longer work a substantial paid job. Administrative Law Judge (ALJ) Elizabeth A. Motta concluded that she was not eligible for benefits because she is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #8), the Commissioner's Memorandum in Opposition (Doc. #9), Plaintiff's Reply (Doc. #10), and the administrative record (Doc. #5).

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Motta's non-disability decision.

## II.     Background

Plaintiff asserts that she has been under a "disability" since July 27, 2013. She was forty-seven years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. § 404.1563(c). She has a high school education. *See id.* § 404.1564(b)(4).

### A.     Plaintiff's Testimony

At the hearing, ALJ Motta asked Plaintiff to focus on the time period between the middle of 2013 and the end of 2015. (Doc. #5, *PageID* #270). Plaintiff testified that her whole body started bothering her beginning in 2011. *Id.* at 270, 278-79. "I was in so much pain I was crying all the time. Couldn't hardly walk.… My hands and stuff [were] crippling up. When I would wake up, I would be a fetal position." *Id.* at 270-71. She began treatment with Dr. Ranginwala who diagnosed rheumatoid arthritis and fibromyalgia. *Id.* at 271, 279. He prescribed her medications—"he had me on so much medication I couldn't even begin to tell you what all he had me on." *Id.* at 273. ALJ Motta looked through the record and found that during the relevant time period, Plaintiff's medications included Neurontin, Amitriptyline, Norco, Cymbalta, Zanaflex, and Flexeril. *Id.* at 272-73. But with those medications, Plaintiff was still in constant pain. The only medications that helped were Flexeril and Amitriptyline. Neurontin caused Plaintiff to pass out and she had to start seeing a heart doctor (who took her off it).

*Id.* at 271, 278.  About a year before the hearing, Dr. Abraham at Pain Innovations prescribed Percocet for fibromyalgia.  *Id.* at 271.  She has also had injections in her right leg.  *Id.* at 271, 281.

Plaintiff's attorney asked her to use September 30, 2015—when she went to OSU Rheumatology—as a benchmark.  *Id.* at 276.  Plaintiff explained that at that time, she had arthritis in both hands but it was worse in her right hand.  *Id.* at 277.  With her right hand, she can barely write and can only turn doorknobs if they are easy.  *Id.* at 277-78.  She cannot open jars, tie two strings, peel potatoes, slice onions, or hold a cell phone.  *Id*.  She uses the speakerphone on her cell phone because she cannot lean her head to either side and it hurts to hold her arms up.  *Id.* at 278.

Plaintiff has depression and anxiety.  She does not see a professional mental-health provider.  *Id.* at 274.  Her family-care doctor prescribes Paxil.  *Id*.

Plaintiff lives with her husband.  *Id.* at 267.  He works and they have insurance.  *Id.* at 268.  On an ordinary day, if Plaintiff takes Amitriptyline and sleeps well, she gets up around noon or 1:00.  *Id.* at 275.  When she wakes up, it takes her hands forty-five minutes to straighten out.  *Id.* at 280.  During the day, she's up and down all day.  She is only able to sit for fifteen to thirty minutes and then she has to get up and walk around (leaning on furniture).  *Id.* at 275, 279.  In the summer, she sits outside and then tries to walk up and down her driveway.  *Id.* at 275.  For four or five months, Plaintiff has fallen three or four times a week.  *Id.* at 280.  She sometimes uses a cane (although it was not prescribed).  *Id*.

Between 2013 and 2015, Plaintiff did not cook very often. *Id.* at 274. Her daughter came over every evening. *Id.* Her husband also cooks. *Id.* at 281. If no one is there, she eats frozen meals. *Id.* Her daughter-in-law does her laundry. *Id.* at 275. She can lift a gallon of milk with her left hand but not her right. *Id.* at 279-80. She is not even able to hold a coffee cup in the morning with her right hand. *Id.* at 280. Plaintiff does not take showers because she once passed out in the shower. *Id.* at 276. She takes baths and her daughter or husband have to help her get out of the tub. *Id.* She stays in her pajamas all day. *Id.* Plaintiff's impairments have had a significant impact on her life: "I can't … even enjoy life. I can't enjoy my grandkids. I don't go to Chuck E. Cheese with them. I can't go outside and play ball like I used to with them. Now if they come to my house, they're taking care of Mawmaw." *Id.* at 281.

**B.     Opinion Evidence**

*i.     Cliff Fawcett, CNP*

Nurse Fawcett completed a physical medical source statement in December 2013. He diagnosed depression, fibromyalgia, and osteoarthritis. *Id.* at 666. He indicated Plaintiff's symptoms include fatigue and pain—specifically, she experiences daily "all over achiness," pain in her right hip and knee, and pain in her hand and fingers (which is worse in the mornings). *Id.* Nurse Fawcett opined that her depression contributes to the severity of her symptoms and functional limitations. *Id.* at 667. Her pain and other symptoms would constantly interfere with her attention and concentration needed to perform simple work tasks. *Id.* She is capable of tolerating low-stress jobs. *Id.* He estimated that she can walk for two blocks without rest or severe pain. She can sit for

five minutes at one time for a total of less than two hours and stand between five and ten minutes for a total of less than two hours. *Id.* at 667-68. Nurse Fawcett opined that Plaintiff would need to take unscheduled breaks every ten to fifteen minutes. *Id*. at 668. Further, she needs to walk every ten minutes for between three and five minutes. *Id*. She can lift and carry less than ten pounds occasionally and ten pounds rarely. *Id*. She can rarely look up, turn her head to the right or left, hold her head in a static position, twist, stoop, crouch/squat, and climb stairs. *Id.* at 669. She cannot climb ladders. *Id*. In an eight-hour working day, Plaintiff can use her hands to grasp, turn, and twist objects ten percent of the time, use her fingers for fine manipulations ten percent of the time, and use her arms for reaching five percent of the time. *Id*. She is likely to be absent from work three or more days per month as a result of her impairments and treatment. *Id.*

   ii.  *Aisha Gargom, M.D.*

Dr. Gargom, Plaintiff's treating physician, completed an impairment questionnaire in April 2016. She indicated that Plaintiff's treatment included medication and she was stable. *Id.* at 756. When asked for Plaintiff's signs and symptoms, she checked twenty-nine boxes, including, for example, decreased energy, mood disturbance, change in personality, emotional withdrawal or isolation, and sleep disturbance. *Id.* Dr. Gargom opined that Plaintiff had a moderate restriction of activities of daily living; extreme difficulties in maintaining social functioning; marked deficiencies of concentration, persistence, or pace; and four or more repeated episodes of decompensation within a twelve-month period. *Id.* at 758. Plaintiff's impairments and treatment would cause her to miss about two or more days of work per month. *Id.* at 759.

In December 2016, Dr. Gargom completed a fibromyalgia medical source statement. She indicated that Plaintiff meets the American College of Rheumatology criteria for fibromyalgia. *Id*. at 873. In addition to fibromyalgia, she diagnosed major depression, anxiety, and migraine headaches. *Id*. Plaintiff's symptoms include multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, frequent and severe headaches, numbness and tingling, Sicca symptoms, anxiety, panic attacks, depression. *Id.* at 874. She noted that Plaintiff has constant pain in her shoulders, thoracic spine, and lumbosacral spine. *Id.* Her pain and other symptoms would constantly interfere with her attention and concentration to perform simple work tasks. *Id.* at 875. She is incapable of even low-stress jobs. *Id.* Plaintiff can sit for five minutes at one time, stand for five minutes at one time, and must walk every five minutes for a total of two minutes. *Id.* at 875-76. She can never carry or lift any weight. *Id.* at 876. She can rarely twist, stoop, crouch, climb stairs, look down, turn her head to the right or left, look up, or hold her head in a static position. *Id.* When asked how many days Plaintiff would miss as a result of her impairments and treatment, Dr. Gargom noted, "unable to work most of the month." *Id.* at 877.

       iii.     *William O. Smith, M.D.*

Dr. Smith evaluated Plaintiff in February 2015. He diagnosed chronic depression and fibromyalgia. *Id.* at 674-75. "Her general physical exam, however, is within normal limits except for a positive straight leg raising on the right." *Id.* at 675. Based on his objective findings, he opined,

6

> [T]he following specific work-related restrictions seem present:
> 1. The claimant is incapable of any lifting, carrying, pushing, or pulling, except for light objects.
> 2. Sitting, standing, and walking arc mildly limited by subjective pain.
> 3. Hearing and speaking are unaffected.
> 4. Traveling is unaffected. She is able to drive if she has to.
> 5. Mental status is one of chronic depression and sadness. She would be capable of managing benefits if awarded.

*Id.*

### iv. Diane Manos, M.D., & Lynne Torello, M.D.[2]

Dr. Manos reviewed Plaintiff's records in March 2015. She opined that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently. *Id.* at 314. She can stand and/or walk for a total of six hours in an eight-hour workday. *Id.* She could never climb ladders, ropes, or scaffolds. *Id.* She can frequently climb ramps and stairs. *Id.* Dr. Manos noted that she did not adopt the prior ALJ's residual functional capacity assessment because Plaintiff's "fibromyalgia appears to be in remission." *Id.* at 315. She concluded that Plaintiff is not under a disability. *Id.* at 319.

In July 2015, Dr. Torello reviewed Plaintiff's records and agreed with some of Dr. Manos' opinions. She did not, however, agree that Plaintiff's fibromyalgia was in remission. *Id.* at 330. Further, she opined that Plaintiff could occasionally balance,

---

[2] State agency reviewing psychologists, Richard J. Hamersma, Ph.D., and Denise Rabold, Ph.D./M.A., reviewed Plaintiff's records and found that she has two severe impairments—fibromyalgia and affective disorder. (Doc. #5. *PageID* #s 311, 327). They adopted the previous ALJ's mental residual functional capacity assessment under Acquiescence Ruling 98-4 (Drummond Ruling).

7

stoop, kneel, crouch, crawl, and climb ramps/stairs. *Id.* She adopted the prior ALJ's residual functional capacity assessment under Drummond. *Id.*

### III. <u>Standard of Review</u>

The Social Security Administration provides Disability Insurance Benefits to individuals who are under a "disability," among other eligibility requirements. *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1). The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope. It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon. 42 U.S.C. § 423(d)(1)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc.*

*Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . . ." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

## IV. The ALJ's Decision

As noted previously, it fell to ALJ Motta to evaluate the evidence connected to Plaintiff's application for benefits. She did so by considering each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 404.1520. She reached the following main conclusions:

Step 1: Plaintiff has not engaged in substantial gainful employment since July 27, 2013.

Step 2: She has the severe impairments of fibromyalgia, affective disorder, and anxiety disorder.

Step 3: She does not have an impairment or combination of impairments that meets or equals the severity of one in the Commissioner's Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

9

| | | |
|---|---|---|
| Step 4: | | Her residual functional capacity, or the most she could do despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), consists of "light work …. The claimant is limited to lifting and carrying up to twenty pounds occasionally and up to ten pounds frequently and can push/pull to the extent that [she] can lift/carry.  The claimant can sit, stand, and walk each up to six hours in an eight-hour workday.  The claimant cannot climb ladders, ropes, or scaffolds and can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.  The claimant must avoid exposure to hazards such as dangerous machinery, unprotected heights, or driving as part of her job duties.  The claimant is limited to frequent handling and fingering bilaterally.  The claimant can work with no more than occasional interaction with supervisors, co-workers, and the public and is limited to no more than simple, routine, repetitive tasks with no persistence limitations but with a pace and stress tolerance that allows for no production quotas." |
| Step 4: | | She is unable to perform any of her past relevant work. |
| Step 5: | | She could perform a significant number of jobs that exist in the national economy. |

(Doc. #5, *PageID* #s 57-69).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 69.

## V.  **Discussion**

Plaintiff contends that the ALJ erred in evaluating the opinion of Cliff Fawcett, CNP, and the medical evidence.  Mr. Fawcett, as a Certified Nurse Practitioner, is not an acceptable medical source and instead falls under the category of "other sources."  20 C.F.R. § 404.1513(d).  Evidence from "other sources" can only be used to show the severity of impairments and how it affects the claimant's ability to work. *Id.*  While an ALJ is required to weigh and provide "good reasons" for discounting the weight given to a treating source opinion, an ALJ is not required to explain the weight given to "other

10

sources." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); Soc. Sec. R. 06-03p, 2006 WL 2329939, at *6 (Aug. 9, 2006).

Although "[i]nformation from these 'other sources' cannot establish the existence of a medically determinable impairment," the information "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Soc. Sec. R. 06-03p, 2006 WL 2329939, at *2. The same factors used to evaluate acceptable medical sources can be used to evaluate opinions from other sources. *Id.* at *4-5. These factors include, but are not limited to, the length and frequency of the relationship, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise, and other factors that tend to support or refute the opinion. *Id.* at *4-5. Although not required by the Regulations, "the adjudicator generally *should* explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning…." *Id.* at *6 (emphasis added).

ALJ Motta assigned Nurse Fawcett's opinion "little weight." (Doc. #5, *PageID* #67). She provided several reasons. First, she found that his opinions were not consistent with the evidence. Second, "He did not point to any objective evidence of his own, such as exam findings." *Id*. Third, "His opinion is inconsistent with largely normal exams by Dr. Ranginwala, the rheumatologist …." *Id* (citation omitted). Last, the ALJ

11

found that Mr. Fawcett's opinion—that Plaintiff would be absent three or more days per month—is "highly speculative and provided without adequate support." *Id*.

Plaintiff asserts that the ALJ erred to the extent she required objective evidence of fibromyalgia. According to Plaintiff, "The ALJ's evaluation of the medical evidence and opinions 'stems from [a] fundamental misunderstanding of the nature of fibromyalgia.'" (Doc. #8, *PageID* #1029) (quoting *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 861 (6th Cir. 2011)).

Case law establishes, and Soc. Sec. R. 12-2p indicates, that a patient suffering from fibromyalgia presents to physicians with no objective signs or symptoms. Indeed, "fibromyalgia can be a severe impairment and …, unlike medical conditions that can be confirmed by objective testing, fibromyalgia patients present no objectively alarming signs." *Rogers*, 486 F.3d at 243 (footnote omitted) (citing *Preston v. Sec'y of HHS*, 854 F.2d 815, 820 (6th Cir. 1988); *Swain v. Comm'r of Soc. Sec.*, 297 F.Supp.2d 986, 990 (N.D. Ohio 2003)); *see also Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (the ALJ mistakenly "depreciated the gravity of Sarchet's fibromyalgia because of the lack of any evidence of objectively discernible symptoms, such as a swelling of the joints."); *Starcher v. Comm'r of Soc. Sec.*, No. 2:15cv3113, 2016 WL 5929048, at *5 (S.D. Ohio 2016) (Kemp, M.J.) *report and recommendation adopted*, 2016 WL 6493427 (Nov. 2, 2016) (Graham, D.J.). Accordingly, the ALJ erred to the extent she required objective evidence of fibromyalgia.

Although Nurse Fawcett diagnosed fibromyalgia, he also diagnosed osteoarthritis and depression. To the extent that Mr. Fawcett based some of his opinions on symptoms from Plaintiff's osteoarthritis, the ALJ did not err by requiring objective evidence.

Further, to the extent that the ALJ was discounting Mr. Fawcett's opinion because he did not explain or cite to any specific records, the ALJ did not err. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion.").

Plaintiff insists that the record supports Nurse Fawcett's opinion. He cites specifically to treatment notes from Dr. Ranginwala, Dr. Abraham, Dr. Hacksaw (at OSU Wexter Medical Center), and Dr. Gargom. For example, Plaintiff points to Dr. Ranginwala's note from August 2013 indicating she had pain all over, could not stand or walk long distances, and had trouble working. (Doc. #8, *PageID* #1030) (citing Doc. #5, *PageID* #620). However, these notes are under the section titled "CC" (chief complaint). In other words, the notes do not refer to Dr. Ranginwala's opinion—they are what Plaintiff reported. Further, in notes from the same appointment, Dr. Ranginwala assessed Plaintiff's "disease" as "clinically stable." (Doc. #5, *PageID* #622). Further, he noted that her fibromyalgia, osteoarthritis, and osteoarthrosis were "under good control[,] medications working well." *Id.*

In addition, Plaintiff identified several of Dr. Abraham's notes from March, April, and May 2015. (Doc. #8, *PageID* #1030). Dr. Abraham indicated that, upon

13

examination, Plaintiff had positive Faber Test bilaterally, positive facet loading bilaterally, tenderness of the paravertebral muscle of the lumbar and cervical spine and bilateral shoulders, and limited range of motion of the lumbar spine/lower back. *Id.* (citing Doc. #5, *PageID* #s 729, 732, 737). While these do tend to support Mr. Fawcett's opinions, there are many other notes that support the ALJ's conclusion. For instance, in July 2015, Douglas Shrewsbury, NP (at Dr. Abraham's office) indicated that Plaintiff had a steady balanced gait. (Doc. #5, *PageID* #944). A month later, in August, 2015, Dr. Abraham likewise noted she had a steady balanced gait. *Id.* at 938. In September 2015, Dr. Hackshaw indicated she had a normal gait. In January 2016, Plaintiff was "[n]egative for back pain and gait problems." *Id.* at 953.

Plaintiff also directs attention to Dr. Hacksaw's notes that her "symptoms sound neuropathic" and that he advised her "neuropathic syndromes are generally long term syndromes that don't go away." (Doc. #8, *PageID* #1030); (Doc. #5, *PageID* #869). It is not clear how Dr. Hackshaw's theory and explanation support Nurse Fawcett's opinion.

Last, Plaintiff points to Dr. Gargom's opinions and a lumbar x-ray[3] from October 2016 that revealed Grade 1 anterolisthesis of L4 and L5 in addition to moderate-to-severe disc degenerative changes at L4 and L5-S1 with facet arthropathy. (Doc. #8, *PageID* #1030 (citing Doc. #5, *PageID* #784). Plaintiff acknowledges that the x-ray results were generated after her date last insured but asserts "it relates to long-documented impairments and symptoms that did not just appear suddenly and thus, the evidence also

---

[3] Plaintiff mistakenly referred to this as an MRI rather than x-ray.

illuminates [Plaintiff's] health before [her date last insured]." *Id.* at 1030 (citing *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). Although it is *likely* that Plaintiff's back problems did not suddenly appear, there is no way to know when they started or deteriorated. Thus, these results do not support Nurse Fawcett's opinion during the relevant time period. Likewise, both of Dr. Gargom's opinions are after Plaintiff's date last insured. (Doc. #5, *PageID* #s 756-59, 873-77).

Although Plaintiff is able to point to some specific treatment notes, "[t]he substantial-evidence standard ... presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). "[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)). In the present case, substantial evidence supports the ALJ's finding that Nurse Fawcett's opinions are not supported by objective evidence in the record.

The court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standard and whether the ALJ's decision is supported by substantial evidence. *Gayheart,* 710 F.3d at 374. In the present case, ALJ Motta applied the correct legal standards to determine that Nurse Fawcett's opinions are entitled to little weight. The ALJ's decision is supported by substantial evidence.

**IT IS THEREFORE RECOMMENDED THAT**:

1. The ALJ's non-disability decision be affirmed; and

2. The case be terminated on the Court's docket.

August 26, 2019                         *s/Sharon L. Ovington*
                                        Sharon L. Ovington
                                        United States Magistrate Judge

**NOTICE REGARDING OBJECTIONS**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).